Norman TICE, Plaintiff and Respondent,

v.

Irvin W. MANDEL, Defendant and Appellant.

No. 7558.

Supreme Court of North Dakota.

March 22, 1956.

Henry G. Owen, Samuel Rubin, Grand Forks, and Lashkowitz & Lashkowitz, Fargo, for defendant-appellant.

Robert A. Alphson, Grand Forks, for plaintiff-respondent.

JOHNSON, Judge.

This is an action for alienation of affections. The plaintiff recovered judgment against the defendant for $5,000 compensatory damages, and $10,000 exemplary damages. A motion for judgment notwithstanding the verdict or in the alternative for a new trial was made by the defend-

ant. The trial court entered an order, dated August 10, 1955, granting the defendant a new trial, unless the plaintiff, within twenty days, consented to a reduction of the exemplary damages to $2,500. This reduction was accepted and the judgment was entered in favor of the plaintiff and against the defendant for $7,500. Thereafter the trial court entered an order denying the motion for a new trial. The defendant appeals to this court from the judgment and the order denying defendant's motion for a new trial.

The complaint in this action is so similar to the complaint set forth in the decision of this court in the case of Rott v. Goehring, 33 N.D. 413, 157 N.W. 294, L.R.A.1916E, 1086, as to appear to have been patterned thereon.

The defendant interposed an answer in which he neither admits nor denies some of the allegations of the complaint and puts the plaintiff on his proof in that connection. Otherwise he denies generally the allegations of the complaint and asserts that the plaintiff and his wife, Jennet Tice, were in collusion to entrap him into a compromising situation by use of a clever trick, scheme, and device in the nature of a conspiracy whereby the plaintiff would be in a position to sue the defendant for a large sum of money.

The appellant sets forth forty-nine specifications of error, five specifications of the insufficiency of the evidence, to sustain the verdict, seven specifications of fact that he says are "conclusively established and not established", and twelve ultimate specifications of error. He argues these matters under seven separate headings:

1. Nature of action for alienation of affections.

2. Intent and motive.

3. Insufficiency of the evidence.

4. Exemplary damages.

5. Sequestration of witnesses.

6. Excessive damages.

7. Swearing of witnesses.

We will deal with the matters argued and presented in the order enumerated.

Appellant's first contention is that alienation of affections and criminal conversation are separate and distinct wrongs. He sets forth numerous citations of authority from other jurisdictions in support of this argument. We need not consider these authorities as the law has been established in the case of Rott v. Goehring, supra, in this state. The appellant made the same contentions at the opening of this trial in the district court at which time the appellant objected to the selection of a jury on the ground that the complaint in the action set forth more than one cause of action. The trial court construed the complaint and ruled that it was solely based upon alienation of affections. In Rott v. Goehring, supra [33 N.D. 413, 157 N.W. 295], this court said:

"Counsel differ as to the nature of the action, appellant's counsel stating that it is for alienation of affections alone, while respondent's counsel assert that it is both for alienation of affections and for criminal conversation. In our judgment it matters little which is technically correct, for in this jurisdiction forms of action are expressly abolished, Section 7355, Comp.Laws (this is now Section 32-0109 NDRC 1943). And if the facts alleged in the complaint, when properly established, entitle plaintiff to any relief under the law, she may recover."

After setting forth the contents of the complaint the court further observed:

"It will be observed that the very pith and marrow of the complaint is that the defendant alienated the husband's conjugal affections from the wife by persuading and inducing him to deny his conjugal society to her and by enticing him to lavish on her his adulterous affections and society, and that she succeeded in repeatedly enticing and persuading him to have carnal intercourse with her."

This also is the gist of the complaint in the action at bar.

The main burden of the appellant's argument rests on the fact that the association of the defendant with the plaintiff's wife did not cause an abandonment of the marriage relationship of the plaintiff and his wife, nor disrupt it in any manner; that during the entire period she worked for the Mandel Department Store and the Mandel Fur Company, at which time the incidents complained of took place, they lived together as husband and wife, and were living together at the time of the trial, and that, therefore, there was no basis for an action of alienation of affections.

■ "A cause of action for alienation of affections consists of three elements; (1) Wrongful conduct of the defendant; (2) loss of affection or consortium; and (3) a causal connection between such conduct and loss." 27 Am.Jur., Husband and Wife, Section 523, p. 125.

■ In this state it is established that an action for alienation of affections will lie even though the plaintiff has not abandoned his spouse. The rule was announced in Rott v. Goehring, supra, as follows:

"An action by a married woman against an unmarried woman for alienation of her husband's affections will lie, even though plaintiff's husband has not completely and in a literal sense abandoned her."

In this connection the court said:

"Conceding therefore, for the sake of argument, that the action at bar is one solely for alienation of affections, as appellant's counsel contend, we are to decide whether the fact that the plaintiff's husband did not actually and in the literal sense of the term abandon her will operate to defeat her right to recover. We are clear that it will not. To hold otherwise would, in our opinion, be a travesty on justice. To hold that the flagrant wrongs inflicted upon plaintiff's marital rights cannot be redressed in the courts, unless the wrongdoer has actually succeeded in destroying the home by causing an actual abandonment thereof by the husband, is contrary not only to common sense, but to our notions of natural justice. If counsel's contention is correct, what becomes of the maxims in the jurisprudence of this state 'no one should suffer by the act of another,' and that, 'for every wrong there is a remedy?' Wherever there is a valuable right and an infringement thereof causing damage, which is susceptible of admeasurement, the law will afford the injured person complete reparation, as far as possible. * * *

"The courts are quite unanimous in holding that the gist of actions of this nature is the loss of consortium, and they are also quite generally agreed that 'consortium' means, as counsel for respondent argues: 'Something more than mere physical presence in the home. To entitle plaintiff to recover it was not absolutely necessary to show actual abandonment—actual abduction —or adultery. * * * To understand this we do not need to go to any musty tomes, nor resort to ancient court decisions; we need consult only our own common sense, our sense of right and wrong, and what we, ourselves, know of human nature. We all know that nothing else—not even death itself— will cause a sensitive wife so much anguish, shame, misery, and heartache as to learn that her husband has been untrue to his marriage vows or has transferred his affections to another. In such circumstances is the wife's agony any less—is the wrong done her any less—by the husband remaining in the family home with her? We know that, in such circumstances, the husband's presence in the family only intensifies the wife's agony, yet the whole defense is based on the assumption that if there was no actual abduction, no actual abandonment, the wife (the plaintiff) suffered no wrong for which the law affords her a remedy.' As said in Adams v. Main, 3 Ind.App. 232, 29 N.E. 792, 50 Am.St.Rep. 266: 'Whatever may have been the principle, originally, upon which this class

of actions was maintainable, it is certain that the weight of modern authority bases the action on the loss of the consortium—that is, the society, companionship, conjugal affections, fellowship, and assistance. * * *'" Rott v. Goehring, 33 N.D. 413, 419, 421, 157 N.W. 294, 295, 296, L.R.A.1916E, 1086.

This applies with equal force where a husband is the plaintiff.

█ It is asserted that as a general rule no cause of action for alienation of affections is complete unless there is an intentional malicious enticing away of a spouse. The intent or motive is to be gathered from the acts involved. "Malice", as the term is used in this type of action, does not necessarily mean that which must proceed from a spiteful, malignant, or revengeful disposition—it means no more than the intentional doing of a wrongful act without just cause or excuse. 27 Am.Jur., Husband and Wife, Sec. 527, pp. 129, 130.

█ An actual intent to alienate the wife's affections is not necessary if the defendant's actions are inherently wrong and seductive and tend to and do have the effect complained of. 42 C.J.S., Husband and Wife, § 662, Motive and Intent, p. 317; Maggay v. Nikitko, 117 Conn. 206, 167 A. 816; Martin v. Ball, 30 Ga.App. 729, 119 S.E. 222; Wendt v. Wendt, 106 Neb. 554, 184 N.W. 66; Moore v. Grimes, 169 Okl. 4, 35 P.2d 944, 945; Eklund v. Hackett, 106 Wash. 287, 179 P. 803.

█ If the loss of consortium is proven then a cause of action exists for which damages are recoverable, and the motive and intent of the defendant in this type of action consists of the intentional doing of a wrongful act, without just cause or excuse. Even if it is conceded for the sake of argument that some blame lies with the wife of the plaintiff, the evidence here shows and the jury must have so believed, that the defendant was primarily the instigator and promoter of the wrongful associations that existed.

It is asserted that the evidence in this action is insufficient to sustain the verdict; that the plaintiff has failed to prove by competent evidence that the defendant alienated the affections of the plaintiff's wife; that the evidence fails to establish that the plaintiff suffered compensatory damages of $5,000; that even after the reduction of the exemplary damages the total judgment of $7,500 is grossly excessive.

The defendant did not testify in his own behalf. The plaintiff testified for himself as to how the marriage relationship had been affected by the matters involved here. His wife testified in detail to the relations that had existed between her and the defendant. On all these matters the record stands undisputed. How this unhappy interlude has affected the marriage of the plaintiff and his wife is, of course, a matter peculiarly within their knowledge.

We will set forth the most pertinent evidence on this issue. The plaintiff's wife was 19 years of age when she started working for the Mandel Department Store and the Mandel Fur Store. The defendant is a man more than twice her age. He was married and the father of children. The plaintiff's wife testified to her indiscretions with the defendant and their illicit relations upon three different occasions. It it true that upon the discovery on May 7, 1954, of what had been taking place between the plaintiff's wife and the defendant, the plaintiff did not abandon his wife. He asserts that he and his wife are trying to forget the past and trying to make a success of their marriage. They are the only ones who can relate or determine how this unhappy interlude has affected or is affecting their marriage.

The plaintiff, after taking the movies in Riverside Park of his wife and the defendant on the afternoon of May 7, 1954, proceeded to his home. He arrived there twenty minutes later. Upon his arrival he found his wife had already gotten home; that she had locked herself in the bathroom, and was sobbing loudly. She refused to open the door. The plaintiff stripped

the lock and when he got inside he found that his wife was slashing her neck and chest with a razor blade. He took the razor blade away from her and proceeded to stop his wife's bleeding. He testified as follows:

"Q. Has this, the fact of this incident come up in your marriage? A. It comes up every once in a while.

"Q. In what way? A. Well, it is with us all the time of course but every once in a while it is brought out somehow. * * *

"Q. How is it brought out? A. Well, something will remind me of it or remind my wife of it and it comes to the surface.

"Q. And what results from this coming to the surface? A. Well, it might end up in a few harsh words and a lot of tension or if my wife brings it up and it shows up,—what I am trying to say is some nights she cries herself to sleep because of it quite frequently. * * *

"Q. What effect, if any, did it have on you on May 7? A. What effect did it have on me on May 7?

"Q. Yes, what did you do or go through? A. What did I go through?

"Q. When you saw this. A. I went through a lot of mental anguish.

"Q. What do you mean by that? What did you feel? A. It kind of rocked me. * * *"

On cross examination the plaintiff testified:

"Q. You were married in September, September 30, 1953, and the baby was born you told us on the 19th of December, 1953 and from that time on you have been happy in your married life? A. Not like we were, not like we planned to be. * * *

"Q. Were you mistaken when you told Mr. Alphson that you had been happy for the most part? A. We

were happy when we can forget about certain incidents."

The plaintiff also testified:

"I didn't enjoy anything since May 7th";

that he was quite upset at the time.

On redirect examination he testified:

"Mr. Tice, was there any change, if any, which took place in your relationship with Jennet after May 7 or after your discovery of this situation? A. Yes, there were quite a few changes.

"Q. What changes? A. Well relations between us tensed up very strongly. There was a barrier between us.

"Q. A barrier? What do you mean? A. We found it hard to be congenial with each other.

"Q. Did you snap at each other? A. At times, yes. We found our affection between each other was a lot of it lost.

"Q. Did she bring up this incident ever or did you or did you have any discussion of it that caused these incidents to erupt? A. Did we have any discussion?

"Q. Yes. A. We discussed it, yes.

"Q. What would it end up like after these discussions? A. Well, she didn't agree with me I guess and I didn't agree with her viewpoint on it in substance. At times we were cold to each other and were removed sort of and we were reminded of quite a few things that reminded us of it, a Cadillac car, a fur store, anything like that."

Jennet Tice, the wife of the plaintiff, testified that she started working for the Mandel Department Store about March 15th. She worked there for about two weeks. Thereafter she was transferred to the Mandel Fur Store upon the request of

the defendant, who gave her a raise of $20 per month. She describes in detail the beginning of the association between herself and the defendant. If her version of the relationship between her and the defendant is to be taken as true, and it is undisputed, and the jury must have believed it, there can be no doubt that the defendant was the one that enticed her to go to lunch with him many times, ride around with him, made love to her, and otherwise courted her affections. Eventually they both forgot their marriage vows.

The trial court discussing this case, upon the motion for a new trial, said:

"It is clear that the plaintiff made out a case for the jury and the verdict of the jury plainly showed that the jurors accepted as true at least most of the testimony of the plaintiff and his wife. In fact the defendant offered no defense except to argue the inference that there was a frame-up between the plaintiff and his wife."

■ We feel that the question of whether the acts of the defendant alienated the affections of the plaintiff's wife was properly submitted to the jury, and that it was within its discretion to determine under all of the evidence what damages, if any, were to be awarded to the plaintiff.

We now come to the issue of whether or not the court properly instructed the jury upon the question of exemplary damages. It is claimed that the instructions given were wholly inadequate and insufficient.

In the case of Lindblom v. Sonstelie, 10 N.D. 140, 86 N.W. 357, 358, this court in dealing with a charge for instruction upon exemplary damages in a similar action said:

"They (the jury) were simply told that exemplary damages might be added in such an amount as they deemed right, without giving the jury any rules to guide them in view of the evidence as given. Exemplary damages may be assessed when the defendant has been guilty of oppression, fraud, or malice,

actual or presumed. Section 4977." (Now Section 32–0307, NDRC 1943).

The trial court in this action defined "malice" and stated that it was "not limited to a malignant and revengeful disposition and intent but includes wrongful and improper motives or intent to do a wrongful and improper act. In cases of adultery committed without the privity, consent or connivance of the spouse (plaintiff's husband in this case) malice is presumed as a matter of law."

Then the court further instructed:

"If you find in favor of the plaintiff for compensatory damages and only in that event you may then turn to the question as to whether you should allow what is termed in law exemplary or punitive damages. If you find from a fair preponderance of the evidence in the case that the defendant committed the acts complained of *willfully and maliciously* as hereinbefore defined you may in your discretion award the plaintiff such additional damages as you may deem proper by way of punishment of the defendant and as an example to others:" (Emphasis supplied.)

Upon this subject the case of Lindblom v. Sonstelie, supra, had this to say:

"The jury should have been instructed in terms that exemplary damages are to be assessed only when fraud or malice, actual or presumed, exists in the case, and that the amount of such damages should be assessed after weighing all the evidence, incriminating or mitigatory, in order to determine the amount. The jury should not have been left to construe the meaning of the words 'malice' and 'exemplary damages' as they saw fit, without any guidance from the court."

■ In the case at bar the trial court had given the jury the necessary basis for determination of exemplary damages. They had been told that if, based upon the preponderance of the evidence, the defendant

committed the acts complained of willfully and maliciously as the word "malice" had been defined, in their discretion they could award plaintiff such additional damages as they might deem proper by way of punishment and as an example to others. The jury was told the circumstances under which they might allow exemplary damages, and the reason for them. The instruction was adequate.

 If the defendant desired more explicit instructions on this matter than were given by the court, he should have presented them to the court in writing with a request that they be given. Carr v. Minneapolis, St. P. & S. S. M. Ry. Co., 16 N.D. 217, 112 N.W. 972; Nevland v. Njust, 78 N.D. 747, 51 N.W.2d 845. No request was made for further or more comprehensive instructions upon exemplary damages.

We now come to the consideration of the appellant's request for the sequestration of the witnesses.

 The defendant was called for cross-examination under the statute by the plaintiff. After the cross-examination of the defendant had been completed, he moved the court to have all of the witnesses removed from the courtroom while the witnesses for either side testified because of the nature of the case. This was resisted by the plaintiff and denied by the trial court. It is argued that the denial of this request constitutes an abuse of discretion by the trial court. The appellant complains that the court made improper remarks before the jury indicating it was of the opinion that this was a rare and unusual motion. It may be noted that the defendant did not make, or request to make, this motion out of the hearing of the jury. The court in response to the motion merely remarked that it did not see any reason for it and that nothing had been brought before the court in that connection, and further stated: "The nature of the case has nothing to do with that 'feature", and in further colloquy between it and counsel for defendant said:

"It would be an inconvenience if we have those witnesses scattered around

the building or around town some place. The only purpose of having witnesses excluded would be to prevent collusion or fraud or something of that sort."

Thereupon the defendant's counsel said: "That is what defendant's counsel is seeking", to which Mr. Alphson said: "Your Honor, this is highly improper". The court thereupon said:

"It is a very highly improper statement. The jury is admonished to disregard the statement made by Mr. Owen to the effect counsel on the other side is seeking collusion or fraud. Pay no attention to it."

No objection was made to this comment of the court. There were other comments and arguments concerning this request. None of the comments or arguments of opposing counsel were prejudicial or prevented the defendant from having a fair trial. The only case cited by appellant in support of his contention is the case of King v. Hanson, 13 N.D. 85, 99 N.W. 1085, 1091, in which it was held that it is within the discretion of the trial judge to exclude witnesses from the courtroom while other witnesses are testifying, and in that case there was no abuse of discretion in so doing. The court in that case said:

"It is said that the great object of examining witnesses is to elicit the truth, and the rule is that, 'if the judge deems it essential to the discovery of truth that the witnesses should be examined out of the hearing of each other, he will so order it. (The process is termed, in many American courts, 'putting under the rule,' but a better term seems 'sequestration.') * * * The ordinary witness may always be subjected to this safeguard.'"

While the appellant insists that the denial of his motion for sequestration of the witnesses was an abuse of discretion, he does not point out how it prevented him from having a fair trial, except to state that it put him in a very unfavorable light before the jury by making it appear that defendant was seeking something that was not just,

fair, reasonable and in accordance with the law as laid down by our supreme court.

When the request or motion was made the defendant had been completely cross-examined under the statute. He had either denied the material facts alleged in the complaint, or had claimed his constitutional privilege and refused to answer the questions on the grounds that to answer them might tend to incriminate him. Nothing developed during the trial of the case which indicates that the trial court's denial operated to the disadvantage of the defendant or in any way aided the plaintiff. In this connection it may be stated that insofar as the material facts are concerned the plaintiff and his wife were the only witnesses that testified directly on the issue involved.

"The court has the right, in the trial of a case, to exclude witnesses from the courtroom, but there is no doctrine requiring the witnesses to be excluded in all cases. * * * But the great majority of jurisdictions follow the early English rule that exclusion, separation, sequestration of witnesses, or 'putting witnesses' under the rule' as the procedure is variously termed, is a matter not of right, but of discretion on the part of the trial court." 53 Am.Jur., Trial, Sec. 31, p. 46; 88 C.J.S., Trial, § 65, p. 173.

"In a civil case, refusal of a request for separation of witnesses is not arbitrary where it is based upon the reason that the request is not made until after the opening statement has been made. Under the majority rule, a motion to exclude witnesses in a civil case need not be granted where no particular reason for the motion, such as conspiracy, exists or is alleged." 53 Am.Jur., Trial, Sec. 31, p. 47.

The denial of the trial court to exclude the witnesses from the court room and the proceedings had and the discussion made in connection therewith in the presence of the jury does not indicate anything prejudicial to the rights of the defendant or which prevented him from having a fair trial. The denial did not constitute an abuse of discretion.

We now come to the consideration of the contention that the damages awarded in this case are excessive. The appellant cites the case of Kinneberg v. Kinneberg, 8 N.D. 311, 79 N.W. 337, as a basis for his claim that the damages awarded in the case at bar were excessive.

It is argued that the evidence establishes that the plaintiff's regard for his wife has not been disturbed by any of the scandalous matters which appear to have occurred. It is not only the plaintiff's regard for his wife, but also hers for him that is to be considered. We have already set out the testimony. It is undisputed. In our opinion it was sufficient to submit the questions of fact to the jury for their determination as to the amount of damages involved, if any. The jury found that the defendant had alienated the affections of the plaintiff's wife.

Kinneberg v. Kinneberg, supra, presented an entirely different situation than is involved in the case at bar. There the plaintiff sought to recover damages for wrongs alleged to have been suffered by her at the hands of the defendant who was her father-in-law. One of the charges was that the defendant had alienated the affections of her husband. The plaintiff obtained a verdict. The defendant made a motion for a new trial which was granted on the third cause of action, but refused on the first. Both parties appealed. The opinion does not discuss the facts, but merely says [8 N.D. 311, 79 N.W. 338]:

"Not only is there no evidence that her husband's affections were alienated, but, on the contrary, it affirmatively appears that his regard for her has not been at all disturbed by any of the scandalous matters which appear to have occurred."

The orders of the lower court were both affirmed.

■ In the case at bar the court instructed the jury as to the law applicable to the determination of damages, if any, as follows:

"A husband is entitled to the society companionship, comfort, protection and aid of his wife and the law gives such husband a right of action against any person who wrongfully and maliciously alienates the wife's affections for him as hereinbefore defined.

"The Court instructs the jury that any unhappiness between the plaintiff and his wife, while living together prior to the acts complained of would not, in itself, constitute a bar to the plaintiff's action, but would go in mitigation or reduction of damages. In cases of this character, the extent of the actual injury to the plaintiff will of course depend upon the prior relations between the plaintiff and his wife. It is proper therefore for you to consider, in mitigation of damages, but not in bar of the action, evidence, if any, which shows any unhappy relations between the plaintiff and his wife, not caused by the defendant.

"If therefore you find that the plaintiff has established all of the material allegations of his complaint by a fair preponderance of the evidence the plaintiff is entitled to a verdict at your hands and then the next question for you to determine in that event will be the amount of damages, if any, that the plaintiff has suffered by reason of the alienation of affections of plaintiff's wife as such damages may be shown by a fair preponderance of the evidence and in that event you should award plaintiff such damages as you believe from the evidence will fairly compensate him for the injury, if any, resulting to him. In that connection the plaintiff may recover for all direct and proximate losses occasioned by the alienation of affections including loss of love and consortium, mental agony, lacerated feelings, wounded sensibilities, and hurt to family life, if

such has been established by the evidence. There is no exact or fixed standard by which such damages can be definitely measured and the Courts have wisely left the amount thereof to the discretion of the jury but the amount granted must be reasonable, and based only upon compensation to the plaintiff, in the light of the circumstances attending the defendant's wrong and the plaintiff's injury, the motives of the parties, the existing state of affections or lack of affections of the spouses at the time of the alleged alienation."

These instructions adequately set forth the proper basis for the determination of damages in an action of this kind.

■ Common sense tells us that although the parties never separated, the events involved in this case have perhaps cast a permanent cloud upon their marriage. These past events may well be a constant source of anguish to the plaintiff and trouble between him and his wife.

"The plaintiff in an action for alienation of affections may recover for all direct and proximate losses occasioned by the tort, including loss of love and consortium, and he or she may recover for any physical pain, mental agony, lacerated feelings, wounded sensibilities, humiliation, blow to honor, hurt to family life, suspicion cast on offspring, etc." 27 Am.Jur., Husband and Wife, Damages, Sec. 543, p. 141. See also 42 C.J.S., Husband and Wife, § 692, p. 347.

In the case of Amellin v. Leone, 114 Conn. 478, 159 A. 293, 294, decided March 8, 1932, a verdict of $3,500 in an action for alienation of affection was held not to be excessive. Commenting on the verdict the court said:

"It is claimed by the appellant that the verdict of $3,500 is excessive, and, while it does impress us as a large verdict, 'injuries such as these are indeed incapable of precise measurement, but, when proven, they do justi-

fy substantial damages. In the light of the circumstances which the jury may have found proven, we cannot say, as matter of law, that the sum awarded was excessive.' Valentine v. Pollak, 95 Conn. 556, 558, 111 A. 869, 870."

It would serve no purpose to attempt to make a comparison of the size of the verdict in this action with verdicts involved in other cases, as the facts and circumstances differ in each case. However, many cases can be found in the books where much larger damages have been upheld for alienation of affections. We will point to a few. In the case of Mulock v. Ulizio, 129 A. 204, 3 N.J.Misc. 631, a verdict for $25,000 was not deemed excessive; in Regenvetter v. Ball, 131 Wash. 155, 229 P. 321, a verdict of $27,500, reduced to $20,000, was affirmed; in Bradbury v. Brooks, 82 Colo. 133, 257 P. 359, a verdict for $23,000 compensatory damages and $2,000 exemplary damages was upheld.

The tendency of the court is towards liberality in fixing compensation in actions of this kind. 27 Am.Jur., Husband and Wife, Damages, Sec. 543, p. 142.

In the case of Judah v. Goldsmith, 90 Ind.App. 81, 164 N.E. 496, it was held that the jury's award of damages for alienation of wife's affections will seldom be interfered with in absence of prejudice or passion. The reason for this rule lies in the fact that there is no method for the determination of exactly the proper pecuniary compensation which should be awarded. See also Annotation: Damages—Excessiveness or Inadequacy, 36 A.L.R.2d 548.

There is also to be considered in determining whether the verdict is excessive that the purchasing and earning power of the dollar has been greatly reduced.

"The amount of this verdict will not purchase more than about half the same amount would purchase before World War II, nor earn in safe, conservative investment more than about half the same amount would earn when so invested 20 years ago." Glatstein v. Grund, 243 Iowa 541, 51 N.W.2d 162, 173, 36 A.L.R.2d 531. See also Umphrey v. Deery, 78 N.D. 211, 246, 247, 48 N.W.2d 897, 915 and 916.

"No arbitrary standard can be erected by which conjugal affection can be tested or measured, since it differs in intensity and constancy with the different temperaments and characters of the individuals, and it may be so superficial that slight provocation will be sufficient to destroy it, or it may be so deeply rooted that it will survive neglect, disgrace, brutal treatment, and desertion." 27 Am.Jur., Husband and Wife, Sec. 524, p. 126.

"All courts recognize the difficulty, if not the impossibility, of formulating any rule to measure loss of consortium and affections in money, and they recognize that a wide latitude must be allowed the jury for the exercise of judgment. Since the jury must arrive at a determination of the amount necessary to compensate the plaintiff in the light of the circumstances attending the defendant's wrong and the plaintiff's injury, the motives of the parties, the existing state of affections or lack of affections of the spouses at the time of the alleged alienation, and the improper relations, even though not known to the plaintiff's spouse, between the plaintiff and another at such time, *the court will not substitute its judgment for the judgment of the jury, however much it may be dissatisfied with the verdict;* its power in this respect is limited to granting another trial, or giving the plaintiff an option to accept a lesser sum than the verdict awards or to submit to a new trial." 27 Am.Jur., Husband and Wife, Sec. 543, p. 142. (Emphasis supplied.)

In the case at bar the trial court upon the motion for judgment notwithstanding the verdict or in the alternative for a new trial reduced the exemplary

damages from $10,000 awarded by the jury to $2,500. This was based on the belief of the court that the jury perhaps had a very exaggerated idea of the financial worth of the defendant. No specific evidence on that matter was submitted.

" 'The plaintiff may introduce evidence showing the wealth of the defendant, so as to enable the jury to determine what damages shall be assessed against him as a punishment, for what might be a severe and excessive punishment to a person of little or no wealth might, on the other hand, be very inadequate when awarded against one whose financial standing is high. As such evidence is admissible in behalf of the plaintiff, so, likewise, the defendant may show that he is poor, or a man of little wealth, so that an excessive amount may not be awarded.' " King v. Hanson, 13 N.D. 85, 105, 99 N.W. 1085, 1092.

In disposing of the motion for judgment notwithstanding the verdict or for a new trial, the trial court in discussing the amount of exemplary damages indicated that its reduction thereof was based upon the fact that although there was no specific showing by either party as to the wealth or lack of wealth of the defendant, there was, however, evidence in the record from which it could be inferred that the defendant was wealthy. The evidence did show that he was a partner in the Mandel Fur Store; that he had an interest in the Mandel Department Store; that he lived in a beautiful home in Grand Forks and operated a Cadillac car; all of which may have tended to indicate substantial wealth. The affidavits submitted upon the motion for a new trial were considered by the court in the determination of this matter. They indicate that the defendant is not a wealthy man. Under the state of the record we believe that the court exercised its discretion in this connection properly and that its action in reducing the exemplary damages was both proper and just.

We cannot say, as a matter of law, under the record that the verdict is unconscionable, and the result of passion and prejudice or clearly not warranted by the evidence.

It is next asserted that the failure to swear Clayton Ness, who operated the movie projector to show the moving pictures taken by the plaintiff on May 7, 1954, constitutes prejudicial error. Section 31-0122, NDRC 1943 provides the form of oath required to be taken by all witnesses. However, Clayton Ness did not give any testimony. He merely exhibited the plaintiff's film with a Bell Howell projector. He was not called to testify. He was called to exhibit by mechanical means evidence already in the record. The record affirmatively shows that he did not give any evidence whatsoever upon the issue or issues involved in this action. The remarks of the court were directed to him merely to ascertain if the setting and lighting were satisfactory for the exhibition of the film. While it was being exhibited the attorney for the plaintiff asked the jury if they could see and they nodded to indicate that they could.

The object of the rule (requiring an oath) is first to affect the conscience of the witness and thus compel him to speak the truth, and also to lay him open to punishment for perjury in case he willfully falsifies. 58 Am.Jur., Witnesses, Oath, Sec. 549, p. 306. There was no reason under this rule why Clayton Ness should be sworn. Since Clayton Ness was not called to testify to any facts involved in this action, it was not necessary to place him under oath.

It is strenuously contended that the verdict of the jury in this case is based on passion and prejudice incited, at least in part, by inflammatory argument by plaintiff's counsel. The argument was not taken by the court reporter. We have, therefore, no way of knowing the exact nature of the argument, except upon affidavits which are not properly a part of the record, and which are based only on recollection as to what was said.

We can well believe that the nature of this case would lend itself to heated jury arguments. But if the plea was impassioned on one side, it appears that it was also of the same nature on the other. Only one objection was made to argument of plaintiff's counsel. He was referring to the failure of the defendant to take the witness stand on his own behalf and it is claimed by the defense that the argument amounted to castigating the defendant for exercising his constitutional privilege of refusing to answer questions upon the ground that they might incriminate him while under cross-examination under the statute. As soon as the objection was made the court reporter was called and plaintiff's counsel was asked to repeat what he had said for the record. This is what he said:

"In this law suit as in all law suits, we know that in the trial of a matter there are two sides and I say that in this lawsuit all the parties should have stood up and been counted and the plaintiff stood up, the plaintiff and his witness stood up and were counted and the defendant,—why didn't the defendant stand up and be counted?"

The defendant took exception and the court ruled as follows:

"The fact of course is that the defendant was called for cross examination under the statute and answered a number of preliminary questions but refused to answer any question that dealt directly with the facts involved in this particular lawsuit, more particularly the questions that were asked relative to taking rides and of course anything that dealt in any way by way of preliminaries to the testimony later given by the plaintiff's wife resulting in sexual intercourse and as this is a civil action the attorney for the plaintiff has a perfect right to comment upon the fact that the defendant in this case did not take the stand on the issues. He has not been on the stand as a witness for himself."

■ The court's comment was proper. In civil actions counsel may properly comment on the failure of a litigant present at the trial to testify to an issue of fact as well as the failure of a party present at the trial to contradict material testimony introduced. The right to comment is not affected by the fact that the party refuses to answer pertinent questions on the ground that the answer might intend to incriminate him. 53 Am.Jur., Trial, Failure of Parties to Testify, Section 469, pp. 374, 375; Johnson v. Kinney, 232 Iowa 1016, 7 N.W.2d 188, 144 A.L.R. 997; Morris v. McClellan, 154 Ala. 639, 45 So. 641, 16 Ann.Cas. 305.

■ After further exchanges between defendant's counsel and the court, the court said:

"Does either side think the reporter is required to be here any further?

"Mr. Owens: I don't know what else will develop. I want to protect my record."

After further remarks, the court stated: "We can excuse the reporter until something else may develop." No objection was voiced by either party. No insistence was made by the defendant for the continuous presence of the court reporter. It is argued that such insistence would have put the defendant in a bad light with the jury. It was within the right of defendant's counsel to have the presence of the court reporter. When the court inquired about this it certainly is not clear that the defendant's counsel wanted the continuous presence of the reporter nor that he wanted the entire argument taken. If he had specifically requested the presence of the court reporter under the circumstances it is certain that the court would have granted that request. No further objections were made to the argument. It must, therefore, be presumed that it was within the record and proper inferences to be drawn therefrom.

■ Counsel is allowed great latitude in presentation of argument, subject, how-

ever, to regulation and control of the court, whose duty it is to confine the argument within proper limitations. Impassioned bursts of oratory, picturesque language, even the use of poetry, as long as it introduces no facts not disclosed by the record, has been held permissible. 88 C.J.S. Trial, § 169, pp. 335, 336 and 337.

 In absence of the record of the argument, although no doubt it was emphatic and impassioned, we cannot say that it was prejudicial or improper, or that the verdict was based on passion and prejudice resulting therefrom.

The appellant relies heavily on the fact that there was no actual abandonment by the plaintiff of his wife, nor did she abandon him. He also contends that the moral and spiritual background of the plaintiff and his young wife was such as to indicate that this whole matter was of no great concern to them; that this was evidenced by the fact that they had adopted out their first-born child. The defendant also argues that he was in fact entrapped, inveigled, and enticed into this situation for the very purpose of trying to procure damages from him; that the whole conduct of the trial was such as to make it impossible for the defendant to procure a fair and impartial trial; that the atmosphere thereof was charged with prejudice against the defendant. These assertions are mere conclusions.

We have thoroughly and closely examined the record with all these matters in mind, and have failed to find substantiation for these contentions.

The record discloses that while there was no doubt intense interest in this trial, as a trial of this kind usually generates considerable morbid curiosity, the record fails to disclose prejudice on the part of the trial court, or incidents in the trial that would prevent the defendant from procuring a fair and impartial trial of the issues involved. Mild laughter occurred twice during the trial and on each occasion the court admonished the audience. One spectator stood leaning against the jury box and when this was called to the court's attention, it was forbidden.

Many specifications of error urged are neither briefed nor argued by the appellant. He merely refers to them in comments which are pure conclusions. He makes no attempt to show how these alleged errors affected the verdict in this action. While errors assigned but not argued will be deemed abandoned, Mevorah v. Goodman, N.D., 68 N.W.2d 469; Clark v. Josephson, N.D., 66 N.W.2d 539, we have, nevertheless, carefully considered all the errors assigned and find that they have no merit. Since there are no prejudicial errors in the record, the judgment and order of the trial court denying the motion for a new trial are affirmed.

BURKE, C. J., and GRIMSON, MORRIS and SATHRE, JJ., concur.